1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   ERIC SEDIE,                              No. C-08-04417 EDL

11            Plaintiff,                      **FINDINGS OF FACT AND
                                              CONCLUSIONS OF LAW FOLLOWING**
12      v.                                    **COURT TRIAL**

13   UNITED STATES OF AMERICA,                Trial: February 1, 2010

14            Defendant.

15   _____/

16          Plaintiff Eric Sedie brought this action for personal injury against Defendant United States of

17   America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, et seq.  Plaintiff,

18   who was riding his bicycle on Paradise Drive in Corte Madera, California, was injured on September

19   23, 2006 in a collision with a United States Postal Truck driven by United States Postal Service

20   employee Glen Rafael.  This matter was tried to the Court from February 1, 2010 through February

21   5, 2010.  Sanford Cipinko and Jeremy Cloyd represented Plaintiff.  Jonathan Lee and Melissa Brown

22   of the United States Attorney's Office represented Defendant.  Both parties consented to a court trial

23   before a magistrate judge pursuant to 28 U.S.C. § 636(c).

24          At trial, Plaintiff contended that as a result of the accident, he sustained painful neck and

25   back injuries that require disc replacement surgery.  Plaintiff also claimed that he had not been able

26   to work since the date of the accident, and that he will not be able to fully pursue his chosen

27   profession of computer-based animator in the future.  At the close of trial, Plaintiff requested

28   damages for past and future medical expenses, past lost income, loss of earning capacity, past and

     future loss of household services, and past and future pain and suffering, totaling in excess of $2.5

United States District Court
For the Northern District of California

1  million.  Defendant argued that Mr. Rafael was not negligent in his operation of the postal truck and

2  that therefore, Plaintiff is not entitled to damages, or that even if Mr. Rafael was negligent, Plaintiff

3  was contributorily negligent and is only entitled to a total of $59,818.06 in damages.

4      On balance, the Court finds that Plaintiff was injured and suffered pain and continues to do

5  so intermittently, but that his testimony revealed a pattern of exaggerations and inconsistencies (as

6  set forth in more detail below) regarding not only his physical injuries and abilities, but also, among

7  other things, the success of his past medical treatment, his employment history, his living situation

8  and his ability to enjoy life.  Accordingly, Plaintiff's testimony is not credible on many points.  On

9  the other hand, the Court did not find Mr. Rafael's testimony as to how the accident occurred to be

10  entirely credible.  Thus, the opinions of Defendant's accident reconstruction expert, Dr. Rajeev

11  Kelkar, are undermined because they are based in large part on Mr. Rafael's explanation of the

12  orientation of the postal truck at the time of the accident.  At the same time, the Court was not

13  persuaded by Plaintiff's accident reconstruction expert, Mr. Paul Herman, either.

14      Also, the Court did not find the opinion of Dr. Kenneth Light to be as credible regarding

15  Plaintiff's need for future medical treatment as that of Dr. Dean Chou and Defendant's medical

16  expert, Dr. Kevin Harrington, primarily because of Dr. Light's very limited contact with Plaintiff,

17  his quick judgment that Plaintiff needed disc replacement surgery for both his neck and back, and

18  his exaggerated and inconsistent testimony regarding the cost of that surgery.  Rather, the Court

19  found most persuasive the testimony of Dr. Chou, because Dr. Chou had the longest and most

20  genuine treatment relationship with Plaintiff, including conducting Plaintiff's only -- and successful

21  -- surgery to date.

22      In addition, the Court does not credit the opinion of Plaintiff's vocational rehabilitation

23  expert, Mr. Thomas Yankowski, which was based in large part on exaggerated statements by

24  Plaintiff and unreliable assumptions regarding future treatment by Dr. Light.  Instead, the Court

25  found Defendant's vocational rehabilitation expert, Mr. Andrew O'Brien, more credible.  Similarly,

26  the opinions of Plaintiff's economist, Mr. Phillip Allman, are based in large part on assumptions

27  about the severity of Plaintiff's limitations and need for future surgery that were not proven by a

28  preponderance of the evidence.  Thus, the Court is more persuaded by Defendant's economist, Ms.

United States District Court
For the Northern District of California

2

United States District Court
For the Northern District of California

Margo Ogus, whose opinions were based on Mr. O'Brien's credible opinions.  The Court found the remaining witnesses for each side generally sincere and credible (although not necessarily accurate as to every single aspect of their testimony).  With this backdrop, the Court makes the following findings of fact and conclusions of law.

**Findings of Fact[1]**

**1.      The accident**

On September 23, 2006, there was a collision in front of 5124 Paradise Drive in Corte Madera between a United States postal truck driven by Glen Rafael and Plaintiff, who was riding his bicycle.  Joint Findings of Fact at 2.  At the accident site, Paradise Drive, which runs essentially east to west, is a winding, downward sloping road, with one lane of traffic in each direction.  Trial Transcript ("Tr") at 449, 451, 538; Deposition of Matthew Mitchell at 12.

Just before the accident, Plaintiff was riding his bicycle in the westbound lane near the fog line on the right side of the road.  Tr. at 579; Joint Findings of Fact at 7, 9.  Plaintiff had an unobstructed view of the fog line and there were no vehicles traveling westbound in front of him.  Joint Findings of Fact at 7.  He passed two other bicyclists, John and Manda Masterson, on their left and then returned to the right side of the road next to the fog line.  Joint Findings of Fact at 2.  John and Manda Masterson were traveling approximately twenty miles per hour.  Joint Findings of Fact at 2, 9.  Plaintiff was traveling approximately twenty-one to twenty-three miles per hour.  Tr. at 40, 54, 64, 142.  After passing the Mastersons, Plaintiff saw the postal truck emerging onto the road and applied his brakes, shouting "Hey, Hey, Hey!"  Joint Findings of Fact at 9; Tr. at 453-54.  Plaintiff estimated that he did not see the postal truck until it was approximately five to eight feet in front of him, and that he braked for two to eight seconds before colliding with the postal vehicle.  Joint Findings of Fact at 9; Tr. at 453-54.

Just before the accident, Mr. Rafael, who had been employed by the United States Postal Service since 1997, had delivered mail to a home at 5124 Paradise Drive.  Joint Findings of Fact at

---

[1]      On March 19, 2010, the parties filed joint findings of fact, and each party filed separate findings of fact.  To the extent that the joint findings are not explicitly set forth in the findings below, they are incorporated by reference as if set out in full.  The Court further notes that its conclusions of law may also contain findings of fact.

**United States District Court**
For the Northern District of California

8.  At all relevant times, Mr. Rafael acted within the scope of his employment with the Postal Service.  Joint Findings of Fact at 2.  As of the date of the accident, Mr. Rafael had been driving the same or similar Long-Life Universal Vehicle mail truck for twelve years, and had been driving the same delivery route on Paradise Drive for about four and one-half years, having driven his postal vehicle in and out of the driveway at 5124 Paradise Drive hundreds of times.  Joint Findings of Fact at 2.  As a safety precaution, while driving along Paradise Drive, Mr. Rafael routinely uses his hazard lights to help others see his vehicle.  Joint Findings of Fact at 8.  One of Mr. Rafael's responsibilities as an on the job instructor was to train other letter carriers regarding the safe operation of the Long-Life Universal Vehicle.  Joint Findings of Fact at 8.

As Mr. Rafael prepared to leave 5124 Paradise Drive after delivering mail there, he walked around his postal vehicle to check for any obstructions and, determining that the area was clear, entered the vehicle and fastened his seatbelt.  Joint Findings of Fact at 8.  Mr. Rafael signaled left to turn into the road.  Tr. at 546-47; Ex. 38.  The collision with Plaintiff occurred almost immediately after Mr. Rafael pulled into the road.  Joint Findings of Fact at 2, 8.

Plaintiff was thrown from his bicycle and landed in the oncoming traffic lane. Tr. at 42.  After the accident, Plaintiff rose to his feet, began yelling and walked to the sidewalk to sit down.  Tr. at 42, 47, 57.

Twin Cities Police Department Officer Matthew Mitchell responded to the accident site, which was described by police dispatch as a minor injury.  Joint Findings of Fact at 3, 9.  He determined that the cause of the accident was the failure to yield to through traffic, and attributed the fault to Mr. Rafael.  Joint Findings of Fact at 9; Mitchell Depo. at 17.  Officer Mitchell did not indicate on the police report for the accident that either Plaintiff's or Mr. Rafael's vision was obscured.  Mitchell Depo at 18.  Officer Mitchell acknowledged the obvious at trial: that he is not an expert in accident reconstruction, nor does he hold himself out to be an accident reconstruction expert.  Joint Findings of Fact at 9.  Officer Mitchell did not take any measurements to determine the postal driver's line of sight and did not perform any calculations regarding the rate of speed or the distance traveled prior to impact.  Joint Findings of Fact at 9; Mitchell Depo. at 17.

Josefina Regis, a supervisor for clerks and letter carriers for the United States Postal Service

4

United States District Court
For the Northern District of California

who is trained in accident investigation, testified at trial that she arrived after the accident and conducted an investigation of it at the accident site on September 23, 2006. Joint Findings of Fact at 3, 9-10. She responded to the accident scene because she was the supervisor on duty on September 23, 2006. Tr. at 116-17. Although she has other job responsibilities and accident investigation is not her primary one, she had investigated other accidents. Joint Findings of Fact at 10; Tr. at 117. She too, admitted the obvious: she is not an expert in accident reconstruction and does not have a degree in physics or mechanical engineering. Joint Findings of Fact at 10. Her investigation included speaking with Officer Mitchell and Mr. Rafael, and taking photographs. Joint Findings of Fact at 3. She did not speak with any witnesses to the accident. Joint Findings of Fact at 3. Ms. Regis reached the conclusion that Mr. Rafael was at fault, and she recommended allowing a claim against the postal service. Tr. at 111, 113. She checked the box on the postal service form stating that there was no conflicting information on the issue of fault, but stated at trial that the only conflicting information was that Mr. Rafael had taken all precautions prior to the accident. Tr. at 111-13.

**2.      Plaintiff's medical treatment**

Shortly after the accident, emergency vehicles arrived on the scene, and emergency personnel placed Plaintiff on a backboard with his neck immobilized to transport him to Marin General Hospital. Joint Findings of Fact at 3, 10. Plaintiff was treated by Dr. Arthur Cohn in the emergency room at Marin General Hospital on September 23, 2006.[2] Joint Findings of Fact at 3, 10; Cohn Depo. at 9-10. Dr. Cohn diagnosed Plaintiff with multiple contusions and abrasions, and cervical strain. Cohn Depo. at 11. Dr. Cohn discharged Plaintiff a few hours after the accident with a soft cervical collar and a prescription for Vicodin, and referred Plaintiff to Dr. Ferretti, who was the on-call orthopedic surgeon. Joint Findings of Fact at 3; Cohn Depo. at 12, 29, Ex. 2. Dr. Cohn did not restrict Plaintiff's ability to work. Cohn Depo. at 12. There is no record of any treatment by Dr. Ferretti, although Plaintiff testified that he had an informal visit with Dr. Ferretti who told Plaintiff to obtain MRI scans if the pain persisted. Joint Findings of Fact at 3, 10; Tr. at 146.

---

[2]      Dr. Cohn did not testify at trial, but the parties designated his deposition in lieu of live testimony.

**United States District Court**
For the Northern District of California

1    After returning home from the hospital, Plaintiff wrote in his journal that: "Everything hurts,

2    from feet to hands to head, can't sleep and feeling more natious [sic] because of the pain pills I've

3    taken? . . . I have a feeling that tomorrow is going to be bad." Ex. 30 at 356.  The day after the

4    accident, Plaintiff wrote in his journal that he was experiencing the "worst pain of my life so far. . .

5    ." Ex. 30 at 357.  Over the next month, Plaintiff wrote in his journal that he was having pain in his

6    back, neck, shoulder, arms and legs, but that his pain level was decreasing.  Ex. 30.

7    On October 6, 2006, Dr. John Wallace saw Plaintiff, who complained of neck and low back

8    pain.[3]  Joint Findings of Fact 91.  Dr. Wallace prescribed pain medications for Plaintiff and referred

9    him to physical therapy.  Joint Findings of Fact at 3, 10.  The pain medication made Plaintiff

10   nauseous.  Tr. at 148.

11   On October 19, 2006, Plaintiff was seen by Dr. Curtis Robinson for a follow up visit after

12   seeing Dr. Wallace.[4]  Joint Findings of Fact at 4, 10.  Dr. Robinson specializes in family medicine.

13   Deposition of Curtis Robinson at 12.  Dr. Robinson consulted with Plaintiff regarding the diagnosis

14   of neck strain and back pain.  Joint Findings of Fact at 10.  Dr. Robinson observed Plaintiff in

15   moderate distress secondary to pain, and found decreased range of motion in Plaintiff's neck.  Joint

16   Findings of Fact at 4.  Dr. Robinson recommended pain medications and physical therapy.  Joint

17   Findings of Fact at 4.  Between October 13, 2006 and October 30, 2006, Plaintiff had seven physical

18   therapy sessions with Mill Valley Physical Therapy for neck and back pain.  Pl.'s Ex. 10.  Dr.

19   Robinson believed on October 19, 2006 that it would not be appropriate for Plaintiff to carry any

20   weight or lift anything much heavier than a pound or two.  Joint Findings of Fact at 4.  Dr. Robinson

21   filled out temporary disability forms that Plaintiff had brought to his office, releasing Plaintiff to

22   work on November 14, 2006.  Robinson Depo. at 15-16.  He advised Plaintiff to return if his

23   symptoms worsened or persisted, but Plaintiff has never returned to Dr. Robinson for treatment.

24   Joint Findings of Fact at 10.

25   On November 1, 2006 and November 8, 2006, Plaintiff was treated by Dr. Walter Newman,

26   _____

27   [3]    Dr. Wallace did not testify at trial, but the parties designated his deposition in lieu of live
testimony.

28   [4]    Dr. Robinson did not testify at trial, but the parties designated his deposition in lieu of
live testimony.

United States District Court
For the Northern District of California

a family friend in San Jose, California, for his neck and back pain.[5]  Joint Findings of Fact at 4; Tr. at 149, 440-41.  Dr. Newman specializes in family general practice and occupational and industrial environmental medicine.  Joint Findings of Fact at 10.  On November 1, 2006, Dr. Newman found that Plaintiff had subjective complaints of neck and back pain with objective findings of injury in the neck and lower back.  Joint Findings of Fact at 4.  Dr. Newman ordered MRI scans of Plaintiff's brain, neck, shoulder and back, which took place on November 7 and 8, 2006.  Joint Findings of Fact at 4, 10-11.  After reviewing the MRI reports, Dr. Newman concluded that Plaintiff had no intracranial pathology, a normal shoulder except for tendinitis, and disc protrusions in the cervical and lumbar spines.  Joint Findings of Fact at 4, 11.  Dr. Newman testified that he believed that there was an "overwhelming probability" that, given Plaintiff's neck and back pain, the disc disease was caused by the accident.  Deposition of Walter Newman at 28-30.  Dr. Newman recalled Plaintiff mentioning some medical/legal remedies, which is reflected on a typewritten document created by Dr. Newman that stated, in part, "Medico-Legal - 1) Value of a case = function of medical. . . .".  Joint Findings of Fact at 11; Newman Depo. at Ex. 5.  Dr. Newman testified that he and Plaintiff discussed that often the value of a case is a function of the medical cost, so that if a person has a greater level of medical care, their case is "bigger."  Newman Depo. at 31.  Dr. Newman does not have an opinion regarding the propriety of disk replacement surgery for Plaintiff, but based on what he knows about that surgery, in his professional opinion, there may be reasons not to have it.  Joint Findings of Fact at 11.  When he evaluated Plaintiff's injuries, Dr. Newman opined that Plaintiff should eventually do well.  Joint Findings of Fact at 11.  Dr. Newman referred Plaintiff to a neurologist or physiatrist in the Marin area because he felt that Plaintiff had significant subjective and objective findings that required a specialist closer to home.  Joint Findings of Fact at 4.

Plaintiff then began treatment by Dr. Irina Melnick, who specializes in nonsurgical treatment of musculoskeletal conditions and is board certified in physical medicine and rehabilitation.  Joint Findings of Fact at 4-5.  Dr. Melnick testified at trial that she treated Plaintiff a total of nine times.  Joint Findings of Fact at 5.  In an example of Plaintiff's tendency to exaggerate, he told Dr. Melnick

---

[5]      Dr. Newman did not testify at trial, but the parties designated his deposition in lieu of live testimony.

that he lost consciousness after the accident.  Tr. at 211.  However, there is no objective evidence showing a loss of consciousness, and the records from the Marin General Hospital Emergency Room reflect that Plaintiff denied losing consciousness, and the postal service investigator's notes reflect no loss of consciousness.  Joint Findings of Fact at 10; Def.'s Ex. II; Deposition of Arthur Cohn at 16-17; Def. Ex. BB1 at 8.  Further, none of the eyewitnesses, including the two bicyclists who saw the accident and talked to Plaintiff right afterwards, testified to any loss of consciousness.

Dr. Melnick prescribed physical therapy for Plaintiff, and in March and April 2007, she recommended discography.  Joint Findings of Fact at 5, 11.  Plaintiff did not undergo discography with Dr. Melnick.  Joint Findings of Fact at 11.  Dr. Melnick opined that Plaintiff's MRI scans that were ordered by Dr. Newman showed a herniated disc at C6-7 and a disc protrusion at C5-6.  Tr. at 213.  Dr. Melnick ordered an objective electromyography nerve conduction study that confirmed that a herniated disc on Plaintiff's neck was impinging on a nerve.  Tr. at 213.  Dr. Melnick performed an injection on Plaintiff's SI joint, the results of which suggested that Plaintiff's L4-5 disc was likely the cause of his pain.  Tr. at 216-17.  Dr. Melnick prescribed traction for Plaintiff's neck pain that, combined with other conservative treatment, provided some relief.  Tr. at 219-20.  Dr. Melnick found no evidence that Plaintiff had preexisting neck or back pain.  Tr. at 214.  The last time Dr. Melnick treated Plaintiff was April 16, 2007, when she was considering more invasive procedures because she felt that Plaintiff had exhausted conservative treatment options.  Joint Findings of Fact at 11; Tr. at 222-23.  She referred Plaintiff to Dr. Dean Chou.  Joint Findings of Fact at 11.

Plaintiff received physical therapy at Mt. Tam Orthopedics based on Dr. Melnick's referral.  He received thirteen physical therapy treatments between December 4, 2006 and January 23, 2007.  Joint Findings of Fact at 5.  Plaintiff reported to physical therapist Jason Mattox on his first visit that his primary complaint was left lower back pain and that he also had shooting pain down his left leg and a deep ache in his neck.  Joint Findings of Fact at 5.  Mr. Mattox testified at trial that he personally treated Plaintiff only five times.  Joint Findings of Fact at 11.  The physical therapy at Mt. Tam Orthopedics Physical Therapy included techniques to mitigate pain and to improve mobility, therapeutic exercises and education regarding the proper way to lift, carry, sit and stand and traction.

**United States District Court**
For the Northern District of California

Tr. at 201-02.  On at least one occasion during physical therapy, Plaintiff could not ride the stationary bicycle due to pain in his back.  Tr. at 203.  Over the course of his treatment with Mr. Mattox, however, Plaintiff reported improvement in his back pain.  Joint Findings of Fact at 11.  Mr. Mattox did not restrict Plaintiff from working during his treatment.  Joint Findings of Fact at 11.  Mr. Mattox did not know why Plaintiff stopped physical therapy.  Joint Findings of Fact at 12.

Subsequently, Dr. Newman ordered a lumbar spine examination, which was done in April 2007 with a dye injection that showed vascularization in the area of the L4-5 disc herniation that can correlate with pain and inflammation.  Joint Findings of Fact at 5.  Dr. Newman gave Plaintiff information about two or three doctors, including Dean Chou at University of California, San Francisco for treatment of his ongoing back pain.  Joint Findings of Fact at 5.

Plaintiff first saw Dr. Chou on May 31, 2007 for pain radiating down his left leg.[6]  Joint Findings of Fact at 5, 12.  During that visit, Dr. Chou determined that Plaintiff had significant pain radiating down his left leg and a disc herniation in his lower back.  Joint Findings of Fact at 5, 12.  Dr. Chou also found that Plaintiff had limited range of motion and tenderness in the neck, decreased sensation in his left arm and trace weakness in the hands.  Joint Findings of Fact at 6.  Dr. Chou felt that Plaintiff had exhausted conservative treatment measures, so he did not implement new conservative measures.  Joint Findings of Fact at 5.

On July 30, 2007, Dr. Chou performed a minimally invasive microdiscectomy to address Plaintiff's leg pain, which involved removing disc material impinging on the L5 nerve root.  Joint Findings of Fact at 5, 6, 12.  Dr. Chou did not treat Plaintiff's back pain because Dr. Chou wanted to see if Plaintiff could bear the back pain once the leg pain was gone.  Joint Findings of Fact at 5-6.  Dr. Chou testified that the result of the microdiscectomy was "good."  Joint Findings of Fact at 12.  According to an August 10, 2007 letter from Dr. Chou to Dr. Newman, Plaintiff stated on that date, less than two weeks after his surgery, that his left side leg pain was completely gone, that he was quite happy with the alleviation of his leg pain, and that his back pain was diminished.  Tr at 671-72; Ex. Z3.  Plaintiff saw Dr. Chou again for a post-operative follow up appointment on August 30,

---

[6]     Dr. Chou did not testify at trial, but the parties designated his deposition in lieu of live testimony.

1    2007, and stated that he was doing "quite well."  Tr. at 672-73; Deposition of Dean Chou at 38, Ex.

2    3.  Dr. Chou believes that, given the totality of the medical information, it is more likely than not

3    that the L4-5 disc herniation was caused by the September 23, 2006 accident.  Chou Depo. at 90.

4        Plaintiff saw Dr. Chou for one follow up appointment on August 30, 2007.  Chou Depo. at

5    38.  Much later, Dr. Chou ordered an MRI of Plaintiff's neck, which was taken on December 27,

6    2008.  Tr. at 514; Ex. 22 at 161; FF1 at 328.  Plaintiff did not see Dr. Chou again until January 8,

7    2009, approximately sixteen months later.  Joint Findings of Fact at 13.  Plaintiff cancelled an

8    appointment with Dr. Chou in February 2008 because he went to Los Angeles with friends who

9    decided to stay longer, and Plaintiff did not reschedule that appointment.  Joint Findings of Fact at

10   13.

11       At the January 8, 2009 appointment with Dr. Chou, Plaintiff complained of neck and arm

12   pain, and no other type of pain (i.e., he did not complain of back pain).  Chou Depo. 44-45.  Dr.

13   Chou described the neck pain as "new."  Def.'s Ex. BB10 at 159.  The only treatment Dr. Chou

14   advised as of January 8, 2009 was conservative treatment including traction; Dr. Chou did not plan

15   surgical intervention.  Chou Depo. at 46, 52.  Dr. Chou told Plaintiff to return if his pain did not get

16   any better following conservative treatment.  Chou Depo. at 52.  Plaintiff did not return to see Dr.

17   Chou after January 8, 2009.  Chou Depo. at 48.

18       On July 2, 2009, Plaintiff's counsel sent Dr. Kenneth Light two disks containing MRI images

19   of Plaintiff taken at South Valley Imaging Center.  Joint Findings of Fact at 13.  Plaintiff saw Dr.

20   Kenneth Light for the first time on July 9, 2009.  Joint Findings of Fact at 6.  Although Plaintiff

21   testified that he self-referred to Dr. Light based on internet research Plaintiff had conducted

22   regarding disc replacement surgery (Tr. at 158-59), the Court finds that the evidence, including a

23   letter from counsel pre-dating Plaintiff's first visit to Dr. Light, shows that Plaintiff's counsel

24   referred Plaintiff to Dr. Light, and counsel had a preexisting professional relationship with Dr. Light.

25   Tr. at 159, 404.  Dr. Light testified at trial that he is a board-certified orthopedic surgeon with a

26   subspecialty in spinal surgery.  Joint Findings of Fact at 6.  He founded and directed the San

27   Francisco General Hospital Spine Clinic for five years beginning in 1986.  Joint Findings of Fact at

28   6.  He founded the Spine Center at St. Francis Hospital in 1992 and worked there until 2007 when he

United States District Court
For the Northern District of California

1   started a private practice. Joint Findings of Fact at 6. Dr. Light ordered a discography for Plaintiff,

2   whereby fluid was injected into multiple levels of Plaintiff's cervical spine after which Plaintiff

3   underwent a CT scan to show any defect in the disc. Joint Findings of Fact at 6. The injection also

4   recreates a patient's symptoms to confirm that a specific disc is responsible for the specific clinical

5   symptoms. Joint Findings of Fact at 6.

6        Plaintiff made several exaggerated statements to Dr. Light that undermine Plaintiff's

7   credibility and, therefore, also the persuasiveness of Dr. Light's opinions, which are based in part on

8   Plaintiff's subjective reports regarding his condition. First, at his July 9, 2009 appointment, Plaintiff

9   told Dr. Light that from the day of his lumbar surgery in July 2007, he had ongoing severe back

10  pain, and that his condition had worsened after the July 2007 surgery. Tr. at 416. However,

11  Plaintiff told Dr. Chou that he was doing "quite well" in August 2007 and confirmed to Dr. Newman

12  in December 2007 that he had a good surgical result. Tr. at 464-65, Ex. FF1 at 745. Although the

13  lumbar surgery focused on alleviating Plaintiff's leg pain, the record demonstrates that Plaintiff did

14  not seek any medical treatment for any neck or back pain from August 2007 through January 8,

15  2009. Tr. at 418, 465. If his pain was truly getting worse, a reasonable response would have been to

16  seek out medical attention, yet Plaintiff did not do so. Second, Plaintiff told Dr. Light that after the

17  accident, he had to move back in with his parents, and that he desired to resume his internship in

18  computer animation in the future. Tr. at 414-16; Ex. 25. However, the evidence shows that Plaintiff

19  has always lived with his parents, and that he had never secured an internship in animation. Tr. at

20  102-03, 742-43, 842-43.

21       In letters dated July 9, 2009, the same day as Plaintiff's initial office visit, and August 20,

22  2009, Dr. Light recommended disc replacement surgery in the neck and back. Ex. 25; Tr. at 388;

23  Joint Findings of Fact 13. At trial, Dr. Light testified that although he had recommended that

24  Plaintiff have two replacement surgeries and Plaintiff had consented, Plaintiff had not had the

25  surgeries because he lacked insurance. Tr. at 399. Plaintiff testified that he did not have insurance,

26  and told his expert Mr. Yankowski that he did not have insurance. Tr. at 142, 313. Plaintiff,

27  however, had to acknowledge that he had the county-based medical insurance benefit called County

28  Services Medical Program (CSMP) throughout 2007, 2008 and 2009 that had covered his surgery by

**United States District Court**
For the Northern District of California

Dr. Chou, contrary to what he told Dr. Light and Mr. Yankowski. Tr. 524. Plaintiff also testified

that his interrogatory responses from August 2009 confirmed that he had CSMP benefits in place

before the July 2007 surgery (Tr. 882-84), even though he had earlier testified that he did not know

if the CSMP benefits paid for the July 2007 surgery (Tr. 475), and that he did not know if the CSMP

authorized the surgery (Tr. at 524).

Defendant's expert, Dr. Kevin Harrington, examined Plaintiff on July 17, 2009. Joint

Findings of Fact at 8; Tr. at 656. Plaintiff complained to Dr. Harrington of pain in his neck, lower

back and right shoulder. Tr. at 666. During the examination, Dr. Harrington observed a marked

difference between Plaintiff's subjective complaints and the essentially normal objective medical

examination. Tr. at 657. At trial, Dr. Harrington testified about Plaintiff's physical condition based

on his review of the surveillance video of Plaintiff taken by Ron Alvestal in September 2009. The

video, which the Court also viewed and which is described in more detail below, shows, among

other things, Plaintiff carrying his dog during walks and lifting him into a car, bending over at the

waist and squatting. Joint Findings of Fact at 16. Dr. Harrington opined that the video shows that

Plaintiff has a normal range of motion in the neck, particularly because Plaintiff looked back over

his shoulder when reversing his vehicle. Tr. at 679. Dr. Harrington also testified that the video

showed that Plaintiff could bend over normally, and that he "can pick up the dog fairly good,

probably a 25-pound dog, put the dog on his shoulder, twist his neck in the process of doing that,

walk down the street, all without any obvious discomfort of any sort or any limitation." Tr. at 679.

Dr. Harrington stated that Plaintiff showed normal extension of his back. Tr. at 680-81 (testifying

that: "his back mobility strength and symptoms were essentially normal"). From the Court's own

viewing of the video, the Court found Dr. Harrington's testimony more persuasive than Plaintiff's

complaints of constant severe disabling pain in his back and neck, although the Court does not

believe that Plaintiff is always as pain free as he appears in the video. Dr. Harrington opined that he

does not believe that disc replacement surgery is indicated for Plaintiff. Joint Findings of Fact at 14.

Dr. Harrington opined that Plaintiff was able to return to work, "barring lifting in excess of 50

pounds, unrepeated bending and stooping," including desk work, within two weeks of the surgery.

Tr. at 683.

Plaintiff testified that to manage his pain, he used two or three of the permitted refills of the pain medications he had been prescribed.  Joint Findings of Fact at 17.  He testified that he refilled his Vicodin and other pain medication prescriptions to address his pain in 2008.  Tr. at 889.  However, the prescriptions reflected in Plaintiff's medical records provided Plaintiff either no refill or only one refill.  Joint Findings of Fact at 17.  The last prescription written for Plaintiff was in January 2008 (Joint Findings of Fact at 17), and no refills were allowed for that medication.  Ex. 29 at 000536.  The evidence on refills of Plaintiff's prescriptions is inconsistent with his testimony.

**3.      Plaintiff's education and employment history**

From January to July 2005, Plaintiff was employed part time by Bollar Stoneworks at a rate of $12 per hour.  Joint Findings of Fact at 15.  In 2004, Plaintiff earned $2,128 in his employment with Bollar Stoneworks.  Joint Findings of Fact at 15.  There is no other documentation of wages earned by Plaintiff in 2004.  Joint Findings of Fact at 15.  In 2005, Plaintiff earned $4,368 working for Bollar Stoneworks.  Joint Findings of Fact at 15.  Between September 2005 and the date of the collision on September 23, 2006, Plaintiff worked as a tile helper for Scarborough Tile with a starting wage of $15 per hour.  Joint Findings of Fact at 7.   In 2005, Plaintiff earned $4,852.50 working for Scarborough Tile.  Joint Findings of Fact at 15.  In 2006, Plaintiff earned $13,213 working for Scarborough Tile.  Joint Findings of Fact at 15.

In May 2005, Plaintiff received a Bachelor of Arts degree from the Academy of Arts University.  Joint Findings of Fact at 7, 14.  At the Academy of Arts, Plaintiff studied to be a Computer Generated Image Modeler or Animator.  Joint Findings of Fact at 14.  After graduation, a person who trains in the field of computer animation usually undertakes an internship for approximately three to six months before seeking a paid position.  Joint Findings of Fact at 14.  Plaintiff has not worked in the field of computer animation in any capacity since his graduation in May 2005.  Joint Findings of Fact at 14.  Plaintiff has not applied for an internship in computer animation since his graduation.  Joint Findings of Fact at 14.  Plaintiff has no past work history as a computer animator.  Joint Findings of Fact at 15.  However, because Plaintiff was only performing tile work part time following his graduation from the Academy of Arts, it was possible for him to pursue additional employment or an internship in  the field of computer animation, but he did not do

13

United States District Court
For the Northern District of California

so.  Tr. at 742, 746-47.  Because Plaintiff had been out of school for approximately sixteen months prior to the accident and had no work experience in the field of computer animation, he would have needed retraining to enter the workforce notwithstanding the accident.  Joint Findings of Fact at 7, 14-15.  The Academy of Arts offers retraining courses to its alumni.  Joint Findings of Fact at 15. As recently as September 2009, there were positions available to Plaintiff in the computer animation and video game industry.  Joint Findings of Fact at 15.  According to Plaintiff, the "single most important way to find a job in the art world" is through personal contacts, and he testified that he has several contacts in the field of computer animation to assist him with his search for employment both locally and in Los Angeles (Joint Findings of Fact at 15), yet he did not use those contacts to secure a position after graduation.  Plaintiff should be able to find a job in computer animation with the assistance of his personal contacts.  Joint Findings of Fact at 15-16.

**4.      Plaintiff's daily life**

Plaintiff testified that because of the accident, every possible aspect of his life has been and will be affected until the day he dies.  Tr. at 476-77; <u>see</u> Joint Findings of Fact at 16.  Since the accident, Plaintiff spends much of his time lying down.  Tr. at 96.  He has not ridden his bicycle, gone running or done any vigorous physical activity since the accident.  Tr. at 516.  Plaintiff stated that doing laundry, going grocery shopping, cooking and walking the dog were some of the activities that have been adversely affected by the accident.  Tr. at 476-77; Docket 116, Att. K, Int. #11 Response at 2-5.

Plaintiff, however, can do his own laundry, grocery shopping and cooking.  Joint Findings of Fact at 16.  Specifically, Plaintiff testified that he is able to do laundry four days per week at least some of the time, that he can grocery shop on a limited basis, and that he can walk his dog two to three times per week.  Tr. at 476.  Further, the surveillance video shows Plaintiff moving in ways that demonstrate that he has a range of motion far greater than he acknowledged, so that he could do laundry and carry groceries.  Ex. LL, YY.  In addition, the surveillance video shows Plaintiff walking his dog several times per day.  Ex. LL.  Plaintiff also told Mr. Yankowski that Plaintiff's typical day is cooking and caring for his father and brother, who was injured in a car accident in 2008.  Ex. NN at 59.

14

**United States District Court**
For the Northern District of California

**Conclusions of Law**

**1.      Negligence**

The Federal Tort Claims Act ("FTCA") renders the United States liable for "injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §§ 1346(b)(1); Yanez v. United States, 63 F.3d 870, 872 (9th Cir. 1995).  Under the FTCA, the substantive law of the forum state, in this case California, applies. 28 U.S.C. § 2674; Yanez, 63 F.3d at 872; Richards v. United States, 369 U.S. 1, 9 (1962).

To prove a negligence claim under California law, the plaintiff must show: "(a) a legal duty to use due care, (b) a breach of that duty, and (c) that the breach was the proximate or legal cause of the injury." Ting v. United States, 927 F.2d 1504, 1513 (9th Cir. 1991) (citing United States Liab. Ins. Co. v. Haidiner-Hayes, Inc., 1 Cal. 3d 586, 594 (1970)).  The existence of a duty is a question of law for the Court.  Ann M. v. Pacific Plaza Shopping Center, 6 Cal.4th 666, 674 (1993).

**a.      Duty**

A driver must exercise the degree of care and caution that an ordinarily careful and prudent person, acting in same or similar circumstances, would exercise. Sills v. Forbes, 33 Cal.App.2d 219, 227 (1939).  "[A driver is] under a duty, both by statute and common law, to operate his vehicle without negligence so as to abstain from injuring any other person or his property." Bewley v. Riggs, 262 Cal.App.2d 188, 194 (1968).  As the driver of the postal truck, Mr. Rafael was under a duty to operate his vehicle without negligence.

**b.      Breach of duty**

The level of care required by a driver of a motor vehicle entering a public roadway includes "yield[ing] the right-of-way to all traffic . . . approaching on the highway close enough to constitute an immediate hazard . . . ."  Cal. Veh. Code § 21704(a).  In general, a driver of a motor vehicle should: (1) make a turning movement only when it can be made with reasonable safety (Cal. Veh. Code § 22107); (2) look both ways before entering an intersection (Holibaugh v. Kishero Ito, 21 Cal.App.2d 480, 486 (1937)); (3) keep a vigilant lookout and see that which may be seen with

15

**United States District Court**
For the Northern District of California

1   ordinary care (Boots v. Potter, 122 Cal.App.2d 927, 935-36 (1954)); and (4) anticipate "the presence

2   on the highway of others who have equal right to be there" (Zarzana v. Neve Drug Co., 180 Cal. 32,

3   37 (1919)).  In some cases, the special character of a vehicle may call for the exercise of greater

4   care.  See, e.g., Shuff v. Irwindale Trucking Co., 62 Cal.App.3d 180 (1976) ("The driver of a large

5   truck . . . should exercise a greater not lesser amount of caution than the ordinary driver and take

6   fewer not more risks than an ordinary driver.").

7        Here, Mr. Rafael testified that his postal truck was parked at the top of the driveway near the

8   mailbox at 5124 Paradise Drive.  Tr. at 541.  He knew the location well, having driven the same

9   postal route for many years.  After delivering the mail, Mr. Rafael walked around the postal vehicle

10  to check for any obstructions.  Tr. at 539.  When checking his mirrors for oncoming traffic, Mr.

11  Rafael saw two bicyclists traveling towards him.  Tr. at 545-46.  He felt that the bicyclists would

12  either yield to him or go around him.  Tr. at 573.  After checking for traffic in his mirrors, and

13  leaning forward to check the roadway, he began to enter the roadway.  Tr. at 539, 544.  Mr. Rafael

14  was inching forward to get a better view of the roadway which was obstructed with foliage.  Tr. at

15  572.  Shortly after easing his foot from the brake pedal, Mr. Rafael heard Plaintiff yell, "Hey! Hey!

16  Hey!"  Tr. at 548.  Mr. Rafael stopped abruptly, and then felt the collision.  Tr. at 548.

17       Mr. Rafael's version of events is not fully credible.  Most significantly, Mr. Rafael has

18  provided inconsistent statements about the position and orientation of the postal vehicle immediately

19  before the accident.  According to Officer Mitchell, Mr. Rafael described his vehicle's position as in

20  the driveway at 5124 Paradise Drive facing out toward Paradise Drive, with his vehicle's mirrors

21  facing down the driveway, i.e., essentially perpendicular to the roadway.  Mitchell Depo. at 12-13,

22  24.  At trial, Mr. Rafael first testified that a photograph (Ex. 55) shown to him during trial showed

23  the orientation of his vehicle when he was creeping forward (Tr. at 567-68), then he testified that it

24  did not reflect the orientation of the vehicle before the accident (Tr. at 568), and in response to the

25  Court's questions, testified that the photograph did reflect the orientation of the vehicle before the

26  accident (Tr. at 569-70).

27       Mr. Rafael's testimony about the position of his postal truck is also inconsistent with the

28  existence of an obstruction to his view of the road.  Tr. at 613.  Defendant's accident reconstruction

16

expert, Rajeev Kelkar, testified that Mr. Rafael provided Mr. Kelkar with different information about the orientation of the postal vehicle than Mr. Rafael provided at trial. Tr. at 613. Specifically, Mr. Kelkar testified that Mr. Rafael told him that the left front corner of the postal vehicle was near the fog line. Tr. at 612. Yet, at trial, Mr. Rafael testified that he signaled left as he inched out of the driveway because he was "more parallel" to the roadway. Tr. at 546-47. Further, Mr. Kelkar stated that Mr. Rafael's description at trial of the vehicle's position is inconsistent with there being an obstruction to his view of the road, inconsistent with the testimony of the Mastersons, who described the postal truck as being in the driveway, and inconsistent with the approximately 45-degree angle that Plaintiff described. Tr. at 613. In fact, there is no indication in either Officer Mitchell's police report or Ms. Regis's accident report that Mr. Rafael complained that his vision was obstructed at the time of the accident. Ex. A4 (police report); A5 (accident report). Although Mr. Kelkar stated that a change in the truck's position would not significantly change his analysis, he conceded that his focus was only to provide a plausible explanation based on reconciling Mr. Rafael's testimony that he stopped and looked, and Plaintiff's testimony that he was traveling at a certain speed on a certain part of the roadway. Tr. at 614.

In fact, Mr. Rafael's differing explanations of the orientation of his vehicle make a significant difference in the accuracy of the accident reconstruction analysis. The defense expert, Mr. Kelkar, testified that under his assumption of the vehicle's position, Mr. Rafael would be seated approximately eight feet north of the fog line. Tr. at 625. But if Mr. Rafael were parked parallel to the roadway, as Mr. Rafael testified at trial, Mr. Kelkar testified that Mr. Rafael would have been seated three feet closer to the fog line. Tr. at 625. Therefore, Mr. Rafael would have had a much better line of sight for the roadway than described in Mr. Kelkar's report. Ex. JJ5 at 000425. Indeed, Mr. Kelker testified that Mr. Rafael would have had complete vision of Paradise Drive eastbound if he was in a position parallel to the roadway. Tr. at 601. Therefore, not only does Mr. Rafael's revised statement of how the vehicle was positioned cast doubt on his testimony, but Mr. Kelkar's analysis of the accident site is undermined by Mr. Rafael's inconsistent testimony about the position of his truck.

The Court was also not entirely persuaded, however, by Plaintiff's accident reconstruction

**United States District Court**
For the Northern District of California

expert, Dr. Paul Herman.  Dr. Herman opined that Mr. Rafael had clear visibility of the bicyclists on

Paradise Drive, yet pulled out in front of the bicyclists when Plaintiff was too close to avoid an

accident.  Tr. at 244; Deposition of Paul Herman at Ex. 1 at 2.  He opined that the mail truck was

driving about six to seven miles per hour at the time of the collision.  Tr. at 245.  As described

above, Dr. Herman concluded that Plaintiff was able to react to the perception of the postal truck in

0.7 seconds, and that 2.2 seconds elapsed from Plaintiff's perception to the collision.  Tr. at 286-87.

Dr. Herman, however, also testified that he did not have adequate time to inspect the postal vehicle

(Tr. at 237), yet he did not follow up with counsel to obtain more time (Tr. at 264-65).  Further, he

did not take several key measurements, including the distance from the driveway at 5124 Paradise

Drive to the point on the roadway where the foliage overhangs the fog line (Tr. 243-44), the distance

from the front bumper of the postal truck to the driver's seat (Tr. at 261), and the distance from the

approximate seated position of the driver on a diagonal over to the mirrors that are on the front left

corner of the vehicle (Tr. at 262).  The lack of these key measurements, especially the distance from

the driveway to the foliage overhanging the road, undermine Dr. Herman's testimony that Mr.

Rafael had an unobstructed view of the roadway prior to the accident.

In addition, in his testimony at trial, Mr. Rafael testified first that when he was leaving the

driveway at 5124 Paradise Drive, he was not depressing the gas pedal, and that he was "covering"

the brake pedal.  Tr. at 549.  He also testified, in response to the Court's question, that he was

"pressing the brake and just covering it, just you know, basically tapping onto it as I'm going onto

the -- as I'm inching onto the roadway."  Tr. at 550.  Mr. Rafael's testimony on this point is

ambiguous.

Further, for the first time at trial, Mr. Rafael mentioned the fact that there were trash cans at

the top of the driveway of 5124 Paradise Drive that he had to avoid as he pulled out of the driveway.

Tr. at 540, 544.  Mr. Rafael testified that when the impact occurred, he was looking in front of his

vehicle to avoid hitting the garbage cans.  Tr. at 567.  The presence of trash cans was not included in

the statement that Mr. Rafael gave to Officer Mitchell or to Ms. Regis.  Ex. A4, A5.  Mr. Rafael's

belated memory of garbage cans obstructing his path of travel casts doubt on the credibility of his

testimony.

United States District Court
For the Northern District of California

1    In addition, there is no dispute, and Mr. Rafael testified, that Paradise Drive is a narrow,

2    winding and hilly road in the vicinity of the accident site.  Tr. at 53, 449, 538, 539.  Bicyclists

3    frequently use Paradise Drive, which is particularly popular on weekends, and drivers must be alert

4    for them. Tr. at 39, 559.  There is no dedicated bike lane at the accident site, and bicyclists also must

5    watch for oncoming traffic.  Eyewitness Manda Masterson testified that on another occasion, she

6    used the driveway at 5124 Paradise Drive to turn around when she was driving her car, and that it

7    was difficult to do.  Tr. at 47.  She testified that she had to stop at the top of the driveway and really

8    look out of the window for bicyclists before pulling out.  Tr. at 47-48.  Plaintiff testified that he

9    knows the Paradise Drive route well, and that bicyclists have to be careful when passing residences

10   on the right-hand side because of the nature of the road.  Tr. at 141.  Mr. Rafael testified that he

11   looked up and down the street before he "inched out" of the driveway at 5124 Paradise Drive.  Tr. at

12   544.  He saw two bicyclists, the Mastersons, yet instead of waiting in the driveway, he determined

13   that it was safe to enter the roadway, believing that the bicyclists would have time to move around

14   him or slow down.  Tr. at 546, 572-73.  If Mr. Rafael was truly carefully "inching" forward to

15   observe oncoming traffic, he should have seen Plaintiff and stopped before he drove well into the

16   roadway, near the center line, as he had when the accident occurred.  Tr. at 59, 457.

17   Finally, there was evidence that prior to the date of the accident, Mr. Rafael had

18   demonstrated reckless driving when running late for work and was cited for driving in excess of 100

19   miles per hour on Highway 37.  Tr. at 557-558; Ex. BB9 at 16.  Mr. Rafael did not receive this

20   traffic citation while on the job, but driving at such a high rate of speed, even on his personal time,

21   indicates that Mr. Rafael is not always as careful as conditions require.  However, the Court does not

22   conclude that he acted recklessly with regard to Plaintiff, and is not necessarily persuaded by

23   Plaintiff's argument that Mr. Rafael must have been careless on the day of the accident because he

24   was running late for lunch.  Mr. Rafael testified that he usually has lunch when he reaches a certain

25   destination, but that he does not have a specific time at which he must take lunch.  Tr. at 559-562.

26   Under the totality of the circumstances, the Court finds that Mr. Rafael did not act

27   reasonably, breaching his duty of care in the operation of the postal truck.

28   //

**United States District Court**
For the Northern District of California

c. **Causation**

To establish causation, a plaintiff must provide evidence that "it is more probable that the event was caused by the defendant than it was not." Raven H. v. Gamette, 157 Cal.App.4th 1017, 1029-30 (2007); Jones v. United States, 933 F. Supp. 894, 900 (N.D. Cal. 1996). Defendant is not liable unless its conduct was a proximate cause of Plaintiff's injury. PPG Indus., Inc. v. Transamerica Ins. Co., 20 Cal. 4th 310, 315 (1999). Here, if Mr. Rafael had not breached his duty of care, it is probable that the accident would not have occurred. Thus, Plaintiff has proven that it is more probable than not that Plaintiff's injury occurred as a result of Mr. Rafael's failure to exercise due care in the operation of postal vehicle. Accordingly, Mr. Rafael acted negligently.

2. **Contributory negligence**

"Contributory negligence is a defense if it is causally connected with the injury," but there is no contributory negligence where a plaintiff's conduct complied with the law and there is no showing that the conduct was a cause of the injury. Simmons v. Wexler, 94 Cal.App.3d 1007, 1014 (1979). However, "Vehicle Code 21804 does not confer an absolute and uncontrolled right upon the driver of a vehicle upon the highway over another vehicle about to enter thereon from a private road. Although such driver may have the right-of-way, he is not absolved of the duty to exercise ordinary care; may not proceed blindly in disregard of an obvious danger; and must be watchful of the direction in which danger is most likely to be apprehended." Malone v. Perryman, 226 Cal.App.2d 227, 234 (1964).

Defendant has not proven that Plaintiff was contributorily negligent. Defendant argues that Plaintiff was traveling twenty-three miles per hour near the fog line at the time of the accident, and argues that this speed was too fast under the circumstances. But there was no evidence to support a finding that Plaintiff was exceeding any speed limit when he collided with the postal truck. Further, Defendant argues that Plaintiff was not wearing a helmet, but Plaintiff did not incur and is not seeking damages for a head injury, so the fact that he was not wearing a helmet does not demonstrate contributory negligence. Further, a person over the age of eighteen is not required to wear a bicycle helmet. Cal. Veh. Code § 21212.

In addition, Defendant argues that Plaintiff was contributorily negligent because Plaintiff

underestimated how close he was to the postal vehicle before he saw it.  Plaintiff testified that he did not see the postal truck until he was approximately five to eight feet from it.  Tr. at 453-54.  Assuming that Plaintiff was traveling at least twenty miles per hour, he would travel twenty-nine feet per second.  Joint Findings of Fact at 8.  Plaintiff's accident reconstruction expert, Dr. Paul Herman, assumed that Plaintiff was able to react to his perception of the postal truck by applying his brakes in 0.7 seconds.  Tr. at 286.  Therefore, in 0.7 seconds, Plaintiff traveled 20.3 feet.  Dr. Herman estimated that the total time interval from the time Plaintiff perceived the postal truck until the collision was 2.1 to 2.2 seconds.  Tr. at 287.  He also assumed that Plaintiff's average speed was eighteen miles per hour, so Plaintiff traveled approximately 57.42 feet prior to the impact, which is 2.2 seconds times 29 feet per second times 0.9 (percentage of 20 miles per hour represented by the average speed of 18 miles per hour).

Although Plaintiff was farther from the postal truck when he first saw it than he testified at trial, the precise distance is uncertain because it is only based on estimates of speed and distance by Plaintiff and eyewitnesses who were experiencing a stressful event.  Thus, Plaintiff and the eyewitnesses understandably may not have noticed the truck at the exact second it began to move, or may not have been able to accurately perceive or recall distance or speed.  Further, Dr. Herman based on his opinions on the assumption that Plaintiff's speed before the accident was twenty-five miles per hour, but Plaintiff testified that he was riding between eighteen and twenty-two to twenty-three miles per hour (Tr. at 142), and the eyewitnesses testified that Plaintiff was traveling at twenty-one miles per hour (Tr. at 40) or twenty-two or twenty-three miles per hour (Tr. at 64).  The Court finds that, at most, Plaintiff was mistaken regarding the distance on the day of the accident, but not that he was contributorily negligent.

### 3.   Damages

Because the Court concludes that Mr. Rafael was negligent, Plaintiff is entitled to damages.  However, as described below, many aspects of Plaintiff's request for damages are not supported by the evidence.

### a.   Special Damages

Under the FTCA, federal courts must use the applicable state law in the computation of non-

United States District Court
For the Northern District of California

1    punitive damages.  <u>See</u> 28 U.S.C. § 2674.  Under California law, the amount of damages a plaintiff

2    may recover is "the amount which will compensate for all the detriment proximately caused thereby,

3    whether it could have been anticipated or not."  Cal. Civ. Code § 3333.  Damages, however, must be

4    reasonable.  Cal. Civ. Code § 3359.

5         "Although damages need not be proved to a mathematical certainty, 'sufficient facts must be

6    introduced so that a court can arrive at an intelligent estimate without speculation or conjecture.'"

7    <u>Harmsen v. Smith</u>, 693 F.2d 932, 945 (9th Cir. 1982), <u>cert. denied</u>, 464 U.S. 822 (1983) (citing

8    <u>Rochez Brothers v. Rhoades</u>, 527 F.2d 891, 895 (3d Cir. 1975)).  However, future damages that are

9    speculative should not be awarded.  Cal. Civ. Code § 3283 ("Damages may be awarded, in a judicial

10   proceeding, for detriment resulting after the commencement thereof, or certain to result in the

11   future.").

12        Furthermore, every injured person, regardless of the manner or extent of the injury, is

13   obligated to take reasonable steps to mitigate his or her injuries or loss.  <u>Guerrieri v. Severini</u>, 51

14   Cal. 2d 12, 23 (1958).  Finally, the FTCA prohibits the recovery of punitive damages against the

15   United States.  28 U.S.C. § 2674.

16            **1.   Past medical expenses**

17        "A person injured by another's tortious conduct is entitled to recover the reasonable value of

18   medical care and services reasonably required and attributable to the tort."  <u>Hanif v. Housing

19   Authority</u>, 200 Cal.App.3d 635, 640 (1988).  Here, Plaintiff seeks an award of $24,191.28 in past

20   medical expenses.  Tr. at 923; Joint Findings of Fact at 8.

21        Defendant does not dispute that Plaintiff's past medical expenses were attributable to the

22   injury.  The Court concludes that the expenses were reasonable and necessary as a result of the

23   accident.  Therefore, Plaintiff is entitled to past medical expenses of $24,191.28.

24            **2.      Past wage loss**

25         Damages for lost wages must not be speculative.  <u>Engle v. Oroville</u>, 238 Cal. App. 2d 266,

26   273 (1965).  Further, a plaintiff has a duty to mitigate damages and cannot recover losses she could

27   have avoided through reasonable efforts.  <u>Thrifty-Tel, Inc. v. Bezenek</u>, 46 Cal.App.4th 1559, 1568

28   (1996).  "If a plaintiff, by [her] own action, unnecessarily enhances [her] loss [she] may not recover

for such enhanced loss." Lewis v. Superior Court, 77 Cal.App.3d 844, 853 (1978) (quoting Green v. Smith, 261 Cal.App.2d 392, 399 (1967)). Here, at trial, Plaintiff stated that he sought $142,689 in past wage loss. Tr. at 924.

Regarding Plaintiff's wage loss, the Court heard from two vocational rehabilitation experts: Mr. Yankowski on behalf of Plaintiff and Mr. O'Brien on behalf of Defendant. The Court also received designated deposition excerpts and reports from Plaintiff's economist Mr. Phillip Allman and Defendant's economist Ms. Ogus.

Plaintiff's statements to his own vocational rehabilitation expert, Thomas Yankowski, cast doubt on the credibility of Plaintiff as well as of Mr. Yankowski on the issue of past wage loss. Plaintiff met with Mr. Yankowski on April 14, 2009. Tr. at 328. Plaintiff told Mr. Yankowski that he had a history of working full time before the accident for Scarborough Tile and Bollar Stoneworks, and slightly less than full time at United Parcel Service. Tr. at 328, 330-31, 334-37. Mr. Yankowski had access to Plaintiff's wage and tax documents that demonstrated the inaccuracy of Plaintiff's statements, as described below, but Mr. Yankowski did not correct his report to adjust for Plaintiff's scantier actual work history. Tr. at 331-337. In addition, Plaintiff told Mr. Yankowski that Dr. Chou was his treating doctor, and that he saw him four times per year. Tr. at 341-42. In fact, Plaintiff did not see Dr. Chou four times per year from the period of May 31, 2007 through January 8, 2009 as he told Mr. Yankowski. Instead, Plaintiff saw Dr. Chou a total of four times during that approximately one and one-half year period. Tr. at 342; Ex. Z3. Plaintiff also told Mr. Yankowski in April 2009 that he continued to receive treatment from Dr. Newman, when in fact, Plaintiff had not received any treatment, including prescription of any medications, from Dr. Newman since 2007. Tr. at 342, 881-882. Plaintiff also told Mr. Yankowski that he anticipated having fusion or disc replacement surgery in the future, but as of that date, Plaintiff had not been told by any physician that he would require future surgery. Tr. at 342. Mr. Yankowski later testified that he had a subsequent telephone communication with Plaintiff in which he learned that Plaintiff was consulting with Dr. Chou and Dr. Light, and was undecided about whether to have future surgery. Tr. at 346-47. Despite knowing that Plaintiff was undecided on future surgeries, Mr. Yankowski testified that Plaintiff had given consent to the surgeries. Tr. at 312-13. Mr. Yankowski

United States District Court
For the Northern District of California

1   never spoke to Dr. Chou about whether Plaintiff would require any future surgeries, even though

2   Plaintiff told Mr. Yankowski that Dr. Chou was his treating physician.  Tr. at 343.

3          Plaintiff also told Mr. Yankowski that Dr. Chou informed Plaintiff that he "must" not work

4   for one year after the microdisectomy.  Tr. at 342.  Plaintiff testified similarly at his deposition that

5   Dr. Chou told him not to work for at least one year, and in reference to whether he was referring to

6   tile setting or not, Plaintiff testified: "[Dr. Chou] said take a year off and don't do any work for a

7   year."  Pl.'s Depo. at 154-55.  In fact, Dr. Chou testified that he did not tell Plaintiff not to return to

8   any work for one year, although he did tell Plaintiff not to return to heavy work.  Chou Depo. at 30.

9   Mr. Yankowski did not talk to Dr. Chou about when Plaintiff could return to work, even though

10  Plaintiff told Mr. Yankowski that Dr. Chou restricted his ability to work.  Tr. at 343.  Plaintiff told

11  Mr. Yankoswki that he had been working full time and living at home to save money for his

12  "definite plan" to move to Los Angeles in early 2007.  Tr. at 356-57.  Plaintiff's father, however,

13  testified that he did not know about a definite plan for his son to leave home.  Tr. at 436.  Mr.

14  Yankowski's testimony is not credible because the information on which he based his opinions is

15  not credible.

16         Based on reports from Mr. Yankowski and Dr. Light, among other things, Plaintiff's

17  economist, Mr. Allman, determined Plaintiff's loss of wages and benefits.  Ex. 48.  Mr. Allman

18  projected Plaintiff's loss of wages and benefits from the date of Plaintiff's injury to Plaintiff's

19  statistical work life expectancy of 29.0 years, and his loss of household services from the date of the

20  injury to Plaintiff's life expectancy of 77.2 years.  Allman Depo. Ex. 1 at 2.  Mr. Allman calculated

21  Plaintiff's past loss from the date of the injury to the first day of trial on February 1, 2010, and future

22  loss from February 2, 2010 through the end of Plaintiff's work life expectancy for wage losses and

23  end of Plaintiff's life expectancy for household services losses.  Allman Depo. Ex. 1 at 2.

24  According to Mr. Allman, Plaintiff's past loss of wages and benefits is $142,689 if he were

25  employed as a computer animator/modeler or $160,530 if he were employed as a tile setter.  Allman

26  Depo. at Ex. 1 at 2.  The present discounted value of Plaintiff's future loss of wages and benefits is

27  $2,042,105 if he were employed as a computer animator/modeler, or $1,665,834 if he were

28  employed as a tile setter.  Allman Depo. Ex. 1 at 2.  The present discounted value of Plaintiff's

United States District Court
For the Northern District of California

1   future mitigating wages and benefits is $1,179,518 if he were employed as a computer

2   animator/modeler, $1,236,238 if he were employed as an apartment property manager, and $825,291

3   if he were employed as a social services assistant/human services worker.  Allman Depo. Ex. 1 at 2,

4   3.  Based on Mr. Yankowski's determination that Plaintiff had a loss of household services of six

5   hours per week, Mr. Allman also opined that Plaintiff's past loss of household services is $23,397,

6   and that the present discounted value of the loss of future household services is $238,166, for a total

7   loss of household services of $261,563.  Allman Depo. Ex. 1 at 3.

8          The Court finds that Mr. Allman's projections lack credibility because they are based on

9   reports by Mr. Yankowski and Dr. Light that the Court also finds lacking in credibility as described

10  above.  Further, the Court is not persuaded that it is probable that, but for this accident, Plaintiff

11  would have worked as a computer animator.  There is no evidence that he ever attempted to work in

12  that field in the fifteen months following his May 2005 graduation from the Academy of Arts until

13  the accident.  Tr. at 786.  Instead, Plaintiff graduated and continued to work on a limited part time

14  basis for Scarborough Tile.  Plaintiff testified that he was saving money to move to Los Angeles to

15  obtain an internship, but the fact that he was working part time and had apparently made no attempts

16  to secure future employment in Los Angeles, cuts against a finding that Plaintiff would have entered

17  the computer animation field in early 2007, as described by Mr. Yankowski.

18         On the other hand, Defendant's vocational rehabilitation expert, Andrew O'Brien,

19  interviewed and examined Plaintiff on September 11, 2009, during the same week that the

20  surveillance video was taken of Plaintiff, including the day before the interview as well as three

21  additional days after it.  Joint Findings of Fact at 16; Ex. LL.  Mr. O'Brien opined that Plaintiff was

22  able to perform sedentary work with the ability to stand up and stretch at Plaintiff's discretion as

23  early as September 1, 2007 and no later than December 1, 2007.  Tr. at 750, 794-95.  In fact,

24  although several doctors have found Plaintiff to be unable to return to work for short periods of time,

25  there is no indication that Plaintiff was disabled after October or November 2007.  On October 6,

26  2006, Dr. Wallace stated that Plaintiff should stay off work until he was feeling better.  Ex. 9 at 7.

27  On October 19, 2006, Dr. Robinson determined that Plaintiff could not return to his regular work

28  until November 14, 2006.  Ex. 9 at 21-23.  Later, on December 6, 2006, Dr. Melnick determined that

United States District Court
For the Northern District of California

1   Plaintiff should not return to work for two months, and then on February 22, 2007, Dr. Melnick

2   found that Plaintiff unable to return to work until May 22, 2007.  Ex. 16 at 49, 53.  On June 7, 2007,

3   Dr. Newman determined that Plaintiff was temporarily disabled for three to four months.  Ex. S2 at

4   42.  Following Dr. Newman's determination, Plaintiff had microdiscectomy with Dr. Chou on July

5   30, 2007, and then had a follow-up appointment with Dr. Chou on August 30, 2007 after which Dr.

6   Chou did not put a time frame on Plaintiff's ability to return to sedentary work, but stated that there

7   would be at least some recovery time.  Chou Depo. at 27-31, 37-41.  Later, on April 22, 2008, the

8   Social Security Administration found that Plaintiff was not disabled.  Ex. FF1at 000432-36.

9       Mr. O'Brien testified that the median wage for sedentary full time employment at the

10  relevant time was from $14.50 for an information clerk or receptionist to just under $18 per hour for

11  a customer service representative.  Tr. at 751.  Mr. O'Brien opined that Plaintiff could start

12  employment at the median wage for an information clerk or receptionist, but would start at the 20th

13  or 25th percentile, or approximately $14.90 per hour, for a customer service representative because

14  that job normally requires some product knowledge.  Tr. at 752-53.  Mr. O'Brien concluded that

15  Plaintiff suffered wage loss following the accident for the closed period from September 23, 2006

16  through November 30, 2007.  Tr. at 753-54.  Mr. O'Brien testified that the usual method to calculate

17  wage loss is to look at past earning history, which was more difficult in this case because there was

18  no full time work history.  Tr. at 754.  Therefore, Mr. O'Brien used Plaintiff's most recent part time

19  wage of $15 per hour.  Tr. at 754.  Because there was no history of full time employment and no

20  indication that Plaintiff would have worked full time, Mr. O'Brien could not assume full time

21  employment during the fifteen month closed period.  Tr. at 754.  The Court finds Mr. O'Brien

22  credible and his testimony persuasive.

23      Moreover, Plaintiff made several statements to Mr. O'Brien at the September 11, 2009

24  interview that cast doubt on Plaintiff's credibility and the credibility of Mr. Yankowski.  At the

25  September 11, 2009 interview, Plaintiff told Mr. O'Brien that when he walks "every step hurts," that

26  he is "never free from pain" in his back, and that he did not "want to bend down with his back at all

27  anymore."  Joint Findings of Fact at 16; NN at 43.  However, the surveillance footage, which was

28  taken during the same week as the interview on September 10, 13, 14 and 16, 2009, shows Plaintiff

United States District Court
For the Northern District of California

chatting with his neighbor, walking, bending down to pick up his dog, carrying his dog over his shoulder with one arm raised, being abruptly jerked by his dog as he walked the dog on his leash, and driving, including twisting his body to look behind him while reversing the vehicle, without any expressions of pain.  Ex. LL.  Plaintiff also told Mr. O'Brien that when he drives, he selects the smaller of two vehicles because it is lower and he does not have to climb in and out of it "so it's easier for me to just kind of throw my legs out the side so I can stand up like that instead of dropping from the SUV."  Joint Findings of Fact at 16-17.  This statement is also inconsistent with the surveillance footage, which shows Plaintiff driving an SUV without any expression of pain.  Ex. LL.  Plaintiff also told Mr. O'Brien that he worked full time at Scarborough Tile, yet when presented with his wage and tax documents, Plaintiff stated that he had been working full time for "probably 9 months, 10 months" after working the first one or two months at three days per week.  Ex. NN at 69-70; CCC at 2:04:30-35.  Even Plaintiff's revised testimony regarding full time employment is not consistent with his tax documents, which showed that Plaintiff did not earn full time wages during that time.  Although Mr. O'Brien testified that Plaintiff's condition has not stabilized, he also testified that Plaintiff did not appear to be in pain during the interview, and that Plaintiff requested only a single break during the interview, which lasted several hours.  Tr. at 788-790.

The Court is also persuaded by the findings of Defendant's economist expert, Margo Ogus, who determined that Plaintiff's total economic loss was $22,871 based on the closed period calculated by Mr. O'Brien.  Ex. JJ4.  Ms. Ogus reasonably assumed that, but for the accident, Plaintiff would have continued to earn at a rate similar to that earned for the first nine months of 2006.  Ex. JJ4.  During the first nine months of 2006, Plaintiff worked as a part-time helper for Scarborough Tile, earning $13,213 up to the date of the injury.  Ex. JJ4.  Ms. Ogus determined that this rate of earnings is equivalent to $18,130 per year.  Ex. JJ4.  Accordingly, the Court awards Plaintiff lost wages of $22,871 for the closed period from September 23, 2006 through November 30, 2007.

### 3.  Future medical expenses and loss of earning capacity

Damages for the loss of future earnings in this context are recoverable "'where the evidence makes reasonably certain their occurrence and extent.'"  Kids' Universe v. In2Labs, 95 Cal.App.4th

27

United States District Court
For the Northern District of California

870, 883 (2002).  To recover damages for future medical expenses, the plaintiff must show: (1) the reasonable value of each of the expected future medical charges; (2) that the future medical care, services or suppliers are reasonably certain to be needed and given in treatment of the injury; and (3) that the condition requiring the future medical care is casually connected to the injuries inflicted by the defendant.  See Cal. Civ. Code § 3283; Hoffman v. Southern Pac. Co., 101 Cal. App. 218, 229-30 (1929).  Here, Plaintiff seeks future medical expenses of $396,000 for disc replacement surgery (Tr. at 923), and $1,005,276 for lost earning capacity (Tr. at 924).  The Court concludes that these future damages are unsupported by the evidence.

### A.  Loss of earning capacity

As described above, the Court finds that Ms. Ogus's opinion regarding wage loss for a closed period is credible.  Further, Mr. Yankowski's opinion regarding restrictions on Plaintiff's future work activity are not credible.  Mr. Yankowski did not speak with Dr. Chou to determine if he placed any work restrictions on Plaintiff.  Tr. at 343, 369.  The only doctor that Mr. Yankowski spoke with about work restrictions was Dr. Light, who in turn had not spoken with Dr. Chou and did not know that Dr. Chou was one of Plaintiff's treating physicians.  Tr. at 352, 364, 412.  By failing to speak with Dr. Chou, who treated Plaintiff most regularly over the longest period of time, Plaintiff's expert selectively analyzed the issue of whether Plaintiff could return to work in the animation field.  Even if Plaintiff were to need workplace accommodations in the form of taking breaks for his back and neck, there is persuasive evidence that he could work as a computer animator with those accommodations.  Mr. Yankowski testified that two of his contacts in the computer animation field stated that it was possible for a person working in that field to keyboard for two hours and then take a half hour break (and the Court is not persuaded that he needs such frequent lengthy breaks on a daily basis), depending on the employer and the project.  Tr. at 361-62.  Mr. O'Brien's contacts also stated that the computer animation field is concerned with the ergonomic health of its employees and that frequent breaks are encouraged.  Tr. at 756-58.  As recently as September 2009, there were positions available to Plaintiff in the computer animation and video game industry.  Tr. at 762-63.

According to Plaintiff, the "single most important way to find a job in the art world" is

United States District Court
For the Northern District of California

1   through personal contacts, and Plaintiff testified that he has several contacts in the computer

2   animation field to assist him with his search for employment in the Bay Area and in Los Angeles.

3   Tr. at 838-39.  Plaintiff already had connections with a well-known animator in Los Angeles whose

4   firm was always in need of interns.  Joint Findings of Fact at 7.  In fact, Plaintiff testified at his

5   deposition  that his brother's friend who worked at Pixar, told Plaintiff about one week after the

6   accident about an entry level job opportunity at Pixar.  Sedie Depo. at 58.  Plaintiff believed he was

7   qualified for the job, but incredibly, stated that did not apply because he did not have the telephone

8   number.  Sedie Depo. at 59.  Plaintiff demonstrated high quality animation work and had the proper

9   skill set to succeed in a career in animation (Joint Findings of Fact at 7), yet Plaintiff has made no

10  effort to secure a position in the field of computer animation.

11                      **B.       Future medical expenses**

12          Of the four doctors who testified about whether disc replacement surgery for Plaintiff is

13  reasonably appropriate or likely to occur, Dr. Light is the only doctor to examine Plaintiff who has

14  recommended disc replacement for both the cervical and lumbar areas.  Joint Findings of Fact at 14.

15  As described above, the Court does not find Dr. Light's testimony credible on this point.

16          Dr. Newman testified that he believes that disc replacement surgery is in its "toddlership," is

17  "highly variable" and "rapidly evolving."  Newman Depo. at 38.  He testified that in his professional

18  opinion, there may be reasons for Plaintiff not have the surgery.  Newman Depo. at 42.

19          Dr. Chou testified that disc replacement surgery is controversial, and that he does not

20  recommend disc replacement in the lumbar spine, especially for someone of Plaintiff's age.  Joint

21  Findings of Fact at 12; Chou Depo. at 46, 110.  In January 2009, Dr. Chou did not recommend

22  cervical disc replacement when he examined Plaintiff's new neck pain.  Chou Depo. at 46, 110.  Dr.

23  Chou stated that before he could opine as to whether Plaintiff needed cervical disc replacement, he

24  would have to perform an examination of Plaintiff.  Chou Depo. at 110.  Plaintiff did not return to

25  Dr. Chou to allow him to do so.  Dr. Chou has performed cervical disc replacement surgery, but

26  since July 2007, he has not recommended lumbar disc replacement surgery for anyone.  Joint

27  Findings of Fact at 12.

28          Dr. Harrington opined that he does not believe that any disc replacement surgery is indicated

United States District Court
For the Northern District of California

for Plaintiff.  Joint Findings of Fact at 14; Tr. at 682 ("Somebody who can do the things that Mr.
Sedie obviously could do and can do from that video doesn't need back surgery and obviously
doesn't need to risk the inherent problems that go with that.. . .  Same thing for the neck.  He
demonstrated on that video a completely normal range of motion. . . . And there's just no indication
for back surgery with all its inherent risks and costs, et cetera, in somebody who has essentially
normal neck function.").  Even Dr. Light testified that the prevailing opinion among surgeons was to
perform fusion surgery, and that the minority opinion was to perform disc replacement surgery.  Tr.
at 403-05.

Further, Plaintiff has not established that he will undergo the disc replacement surgeries.
Plaintiff told Mr. Yankowski in late October or early November 2009 that he had not made a
decision regarding future surgeries. Tr. 344-47.  On November 9, 2009, Plaintiff sent an email to
Dr. Chou's office seeking a "trusted second opinion" about disc replacement surgery.  Joint Findings
of Fact at 13; Ex. FF1 at 752.  As of the date of trial on February 1, 2010, Plaintiff had not seen Dr.
Chou for a second opinion.  Tr. 485.

Even if disc replacement surgery were indicated for Plaintiff, the Court does not find Dr.
Light's testimony persuasive on the issue of the cost of the surgery.  Because Dr. Light's testimony
is inconsistent at best, the Court finds that Dr. Light's testimony in this case about the cost of the
surgery was not credible.  Dr. Light testified on direct examination at trial that the cost of disc
replacement surgery for Plaintiff would be approximately $225,000 per surgery for a total of
approximately $450,000, if he were insured.  Tr. at 399-400.  But Dr. Light also testified on cross-
examination that an estimate from Implantium, LLC for $396,000 in surgical costs was exaggerated.
Tr. at 406-08.  Dr. Light's testimony about the origin of the estimate of $396,000 is inconsistent with
Plaintiff's counsel's letter to Plaintiff's expert Mr. Yankowski describing the $396,000 estimate as
Dr. Light's.  Ex. L7.  Dr. Light acknowledged on cross-examination that in a different lawsuit in
state court, he testified in deposition that the total cost of lumbar disc replacement was $60,000.  Tr.
408-09.  And he testified at the state court trial in that suit that the total cost of the disc replacement
surgery would be $75,000.  Tr. 423-25; Ex. SS at 123.  Then, Dr. Light testified on cross-
examination at this trial that the cash price for the two surgeries for Plaintiff would be $165,000

United States District Court
For the Northern District of California

1   total, rather than $450,000.  Tr. at 425-27.  Dr. Harrington also testified about the reasonable cost for

2   the disc replacement surgeries, which he estimated at $50,000-60,000 for each surgery, for a total of

3   $100,000-120,000.  Tr. at 686.

4        Accordingly, the Court does not award any damages for future wage loss or future medical

5   expenses.

### 4.   Loss of Household Services

7        Mr. Yankowski opined that Plaintiff has a loss of six hours of household services per week

8   due to the accident, which Mr. Yankowski values at $23 per hour, payable for the remaining forty

9   years of Plaintiff's life expectancy.  Tr. at 326-27; Joint Findings of Fact at 16.  Given the evidence

10  that Plaintiff is able to engage in household activities such as doing laundry (Tr. at 104), grocery

11  shopping (Tr. at 105), and commendably helping to take care of his father and brother, including

12  "round-the-clock care" of his brother in the first months after his brother's serious accident (Tr. at

13  835), there is no basis for an award of household services, particularly at a rate that is higher than

14  the hourly wage Plaintiff earned as a tile-setter.  The Court does not award any damages for loss of

15  household services.

### 5.   Pharmacy and parking receipts

17       Plaintiff produced evidence to support an award of damages for parking and pharmacy

18  receipts.  Ex. 28, 29.  These costs are recoverable because they were proximately caused by the

19  accident.  See Cal. Civil Code § 3333.  Pursuant to the receipts produced by Plaintiff, he is entitled

20  to an award of $75.00 for parking expenses and $487.38 in pharmacy expenses.

### b.   General Damages

22       California law entitles a negligently injured person to pain and suffering damages in order to

23  compensate for any pain, discomfort, feats, anxiety and other mental and emotional distress, as well

24  as the loss of the capacity to enjoy life.  See Capelouto v. Kaiser Found. Hosp., 7 Cal. 3d 889,

25  892-93 (1972) (en banc).  There is no fixed standard for determining pain and suffering damages

26  under California law; rather, the trier of fact is required to determine the amount of damages that are

27  just and reasonable in light of the evidence.  The detriment resulting from pain and suffering is

28  difficult to translate into monetary loss, but it is a genuine one that must be compensated.  See

United States District Court
For the Northern District of California

1    Capelouto, 7 Cal. 3d at 893.

2        Here, Plaintiff seeks $250,000 in general damages for past pain and suffering damages and

3    $500,000 in general damages for pain and suffering.  While the Court agrees that Plaintiff has

4    experienced pain and suffering and will continue to experience some from the accident, these

5    amounts are not supported by the evidence.

6        Plaintiff has claimed in this case that his pain and suffering are constant and that his life has

7    been ruined by the accident.  Joint Findings of Fact at 16.  Plaintiff also describes his life as "hell on

8    earth" and states that "every possible aspect of his life has been affected and will be affected till the

9    day I die."  Docket 116, Att. K (Response to Int. #11); Att. L (Supp. Response to Int. #11).  While

10   the Court agrees that Plaintiff has incurred some general damages attributable to the accident, the

11   evidence belies Plaintiff's claim of constant pain, and renders not credible Plaintiff's testimony

12   regarding the extent of the pain.  For example, the surveillance video shows Plaintiff engaged in

13   activities on several different days in September 2009 that are inconsistent with his claims regarding

14   the severe curtailment of his daily activities (in both testimony to the Court and his statements to

15   doctors and experts in this case), as well as his claims of constant, debilitating pain.  On September

16   10, 2009, Plaintiff is shown fueling a Nissan Sport Utility Vehicle and later walking his dog twice.

17   The video also shows Plaintiff carrying his dog, which weighed twenty-three pounds as of

18   September 2009, on his shoulder.  Later that day, on a different walk, the video shows Plaintiff

19   carrying the dog into his residence after returning from a walk.  On September 13, 2009, the video

20   shows Plaintiff leaving a store, walking to the SUV, and driving away.  Notably, when Plaintiff

21   drove away, he twisted his neck and body around to look behind him as he reversed the SUV.  That

22   afternoon, Plaintiff walked his dog, leaving the house at 1:36 p.m., entering a neighbor's residence,

23   and returning home at 2:36 p.m.  On September 14, 2009, the video shows Plaintiff leaving his

24   house with the dog at 12:04 p.m.  The dog jerked hard on the leash and Plaintiff showed no facial

25   expression of pain.  Ex. AAA, BBB.  That same day, the videotape shows Plaintiff visiting with a

26   neighbor, bending down and squatting to pet a small dog, and picking the dog up.  Later that day, the

27   video shows Plaintiff carrying a bag of groceries, with no apparent discomfort, and walking his dog

28   two more times.  The video also shows Plaintiff picking up his dog several times by bending over at

United States District Court
For the Northern District of California

1   the waist. Ex. YY, ZZ. On September 16, 2009, the video shows Plaintiff walking his dog on a

2   leash to the SUV and then picking the dog up and placing him inside by extending his body through

3   the driver's side door. Ex. LL. Later than day, the video shows Plaintiff carrying his dog, walking

4   to the SUV, and getting in the vehicle while holding his dog. The Court notes, however, that the

5   surveillance video does not show that Plaintiff ever left his general neighborhood.

6          Plaintiff testified that he could see himself wincing in pain several times as the surveillance

7   video was played in court. Tr. at 171-184. However, the Court's examination of the videotape does

8   not reveal any wincing or pain expressions by Plaintiff. Plaintiff's testimony on this point is not

9   credible, particularly because he was reluctant to even confirm at one point whether he was the

10  person in the video. Tr. at 181. Further, during that same week that the video was taken, Plaintiff

11  told Mr. O'Brien, Defendant's vocational rehabilitation expert, that he was in constant pain (Tr. at

12  739), which is inconsistent with the video. In addition, Dr. Harrington testified that the range of

13  motion in Plaintiff's low back and neck in performing the activities shown on the video is normal.

14  Tr. at 678-83.

15         Other evidence also undermines the extent of Plaintiff's general damages. Plaintiff testified

16  that he spends much of his time lying down, and there are times that he does not leave his room

17  because he is depressed about his overall situation. Tr. at 96, 169. However, the Court finds this

18  testimony is only partially accurate, and is exaggerated given the other evidence of his actual

19  activities and his pattern of exaggeration. For example, Plaintiff's online writings show that his life

20  was not constantly "hell on earth" as he claimed. Docket No. 116, Att. K (Pl.'s response to

21  Interrogatory 11) at docket page 42. Plaintiff maintained his pages on MySpace and Facebook since

22  the accident (Tr. at 486), and as of January 12, 2010, his MySpace page listed various activities and

23  hobbies, and friends of Plaintiff. Ex. UU. Plaintiff wrote entries on his MySpace page, including

24  one on June 3, 2007, in which he described painting as a frustrating activity when his arm hairs

25  would get caught in paint. Ex. TT. Yet painting was on the list of activities that Plaintiff claims

26  were adversely affected by the accident. Docket 116, Att. K at Response to Int. #11. Plaintiff also

27  testified that he had not done any painting since the accident, but the MySpace entry was written in

28  the present tense at a time just prior to his microdiscectomy. Ex. TT; Tr. at 167, 490. Plaintiff

**United States District Court**
For the Northern District of California

1    testified that the MySpace entry was a joke, but the Court did not find the testimony credible.

2         Plaintiff also testified that 40-45% of his lumbar disc had been removed in Dr. Chou's

3    microdiscectomy, and that he has bone-on-bone contact in his lower back.  Joint Findings of Fact at

4    17; Tr. at 478.  Medical doctors, however, testified to the contrary.  Dr. Light testified that less than

5    10% of the lumbar disc had been removed.  Tr. at 421.  Dr. Chou testified that he did not believe

6    there was any bone on bone contact.  Chou Depo. at 73.  Plaintiff's claims of the scope and extent of

7    his lumbar spine injury were exaggerated.

8         Plaintiff testified that his low back pain remained and indeed increased following the

9    microdiscectomy, but this is not consistent with the evidence at trial.  In particular, despite the

10   allegedly increasing pain, Plaintiff did not seek any medical attention from August 31, 2007 through

11   January 8, 2009.  When he saw Dr. Chou on January 8, 2009, he did not complain of back pain.

12   Chou Depo. at 44-45.  Instead, the next time Plaintiff complained of back pain was when he saw Dr.

13   Light, the doctor recommended by Plaintiff's attorney, on July 9, 2009.

14        Plaintiff testified that he can no longer be physically active.  While the Court does not credit

15   Plaintiff's testimony about the extent of his limitations and pain, it is undisputed that Plaintiff no

16   longer bikes or engages in other sports or vigorous physical activity in contrast to before the

17   accident when he regularly engaged in and took pleasure in such activities.  Further, he is not able to

18   do heavy labor such as tile setting, which he did before the accident.  Tr. at 316, 748, 776, 792.

19   Thus, Plaintiff has suffered a loss of enjoyment.

20        The evidence reflects, however, that Plaintiff was in fairly severe pain that adversely affected

21   his enjoyment of life and ability to work from September 23, 2006, the date of the accident, through

22   July 30, 2007, the date of his microdiscectomy, and intermittent pain through the present, and that he

23   has suffered and continues to suffer some loss of enjoyment of life, particularly the curtailment of

24   strenuous exercise which he previously enjoyed.  Accordingly, the Court awards Plaintiff $175,000

25   in general damages for past pain and suffering and loss of enjoyment, and $75,000 in damages for

26   future pain and suffering and loss of enjoyment.

27   **Conclusion**

28        Plaintiff proved Defendant's liability under the Federal Tort Claims Act for injuries he

United States District Court
For the Northern District of California

1    suffered when he collided with the United States postal vehicle.  The Court HEREBY AWARDS

2    judgment on the merits in favor of Plaintiff in the amount of $297,624.66.

3         **IT IS SO ORDERED.**

4    Dated:  April 21, 2010                    _Elijah D. Laporte_____
                                               ELIZABETH D. LAPORTE
5                                              United States Magistrate Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28